NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**PHILIP EMIABATA, DBA PHILEMA BROTHERS,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2019-1041

_____

Appeal from the United States Court of Federal Claims in No. 1:17-cv-00447-PEC, Judge Patricia E. Campbell-Smith.

_____

Decided: December 6, 2019

_____

PHILIP EMIABATA, Pflugerville, TX, pro se.

KARA WESTERCAMP, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant-appellee. Also represented by JOSEPH H. HUNT, TARA K. HOGAN, ROBERT EDWARD KIRSCHMAN, JR.

_____

Before PROST, *Chief Judge*, DYK and WALLACH, *Circuit Judges*.

PER CURIAM.

Appellant Philip Emiabata filed suit against the U.S. Postal Service ("USPS") in the U.S. Court of Federal Claims, alleging, inter alia, wrongful termination for default of a delivery contract awarded to Mr. Emiabata ("the Delivery Contract") by the USPS, and seeking monetary damages related to the USPS's administration of that contract. Mr. Emiabata appeals two opinions of the Court of Federal Claims. First, Mr. Emiabata challenges an opinion of the Court of Federal Claims granting the United States' ("Government") motion to dismiss Mr. Emiabata's contract-based claims for monetary damages under Rule 12(b)(1) of the Rules of the U.S. Court of Federal Claims ("RCFC"). *Emiabata v. United States*, 135 Fed. Cl. 213, 221 (2017) (S.A. 14–25).[1] Second, Mr. Emiabata challenges an opinion of the Court of Federal Claims granting the Government's motion for summary judgment as to Mr. Emiabata's wrongful termination claim. *Emiabata v. United States*, 139 Fed. Cl. 418, 427 (2018) (S.A. 1–13). We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2012). We affirm.

## BACKGROUND

In September 2015, the USPS issued Solicitation No. 150-299-15, requesting proposals on a services contract to transport and deliver mail between Cincinnati and Milford, Ohio. S.A. 28, 46, 48. Mr. Emiabata submitted a

---

[1]    Mr. Emiabata provided an appendix with his opening brief, which was not successively paginated. For clarity, we will refer to the Government's supplemental appendix, which contains the same relevant documents. We reference the Government's supplemental appendix as "S.A."

proposal dated October 7, 2015, on behalf of Philema Brothers, a sole proprietorship owned by Mr. Emiabata, S.A. 2, offering to perform the proposed transportation and delivery services for $70,000 per year, S.A. 43–44. Mr. Emiabata included with his proposal an "Employee Vacation Declaration and Driver Information Sheet," identifying himself and Sylvia Emiabata as the only "employees . . . assigned as drivers" to the proposed route. S.A. 95; *see* S.A. 127. Mr. Emiabata also submitted to the USPS a "Contract Personnel Questionnaire" ("Form 2025") dated September 22, 2015 ("the September 2015 Form 2025"), S.A. 30, 97–98,[2] in which Mr. Emiabata responded "N/A" to Question 22, which asked: "In the past [five] years, have you been convicted of any traffic violations (other than parking) or currently have charges pending?," S.A. 98 (capitalization altered).

On December 14, 2015, during a "pre-award conference," the USPS discussed with Mr. Emiabata: "[i]nsurance requirements," viz., that Mr. Emiabata "must maintain the required level of insurance for the entire term of the contract[,]" and that "[a] copy of the policy declaration page must be provided to the [c]ontracting [o]fficer[,]" S.A. 136–37; *see* S.A. 57 (detailing the "Insurance Requirements" required under the Delivery Contract), 133 (same); and a "listing of the required forms" to be submitted to the USPS, including a completed Form 2025[3] and a "[f]ive-year

---

[2] Although the September 2015 Form 2025 was "submitted for" the Delivery Contract, and was included as part of the USPS's contract file, S.A. 30, it is unclear from the record whether Mr. Emiabata submitted this form with his proposal.

[3] It is unclear from the record why the USPS required Mr. Emiabata to submit a second completed Form 2025.

driving record" for "[Mr. Emiabata] and all persons [he] anticipate[d] employing to perform the contract," S.A. 136.

Mr. Emiabata submitted to the USPS an "Application for Insurance" and temporary insurance card dated December 16, 2015, from Progressive County Mutual Insurance Co. ("Progressive"), having a "[p]olicy period" of December 16, 2015, to December 16, 2016. S.A. 139–42. Although the temporary insurance card identified Philema Brothers as the "[i]nsured," the name of the "[r]ated driver[]" had been redacted. S.A. 139, 142. Mr. Emiabata also submitted to the USPS a "Commercial Auto Insurance Coverage Summary" dated December 17, 2015 from Progressive, having the same "[p]olicy [p]eriod" as the Application for Insurance. S.A. 144–47. This document, again, identified Philema Brothers as the "insured," but identified "Roland Hunter" as the only "[r]ated driver." S.A. 144.

On December 29, 2015, the USPS accepted Mr. Emiabata's proposal, and awarded him the Delivery Contract, HCR No. 450D3. S.A. 40, 92–93; *see* S.A. 43–44 (Delivery Contract), 48–59 (Statement of Work and Specifications), 61–90 (Terms and Conditions). The Delivery Contract was to run from December 29, 2015, to June 30, 2019. S.A. 92. However, "[d]ue to defective equipment, performance was not able to be scheduled to commence until February 5, 2016." S.A. 40.

On January 14, 2016, the USPS "met with Mr. Emiabata" a second time, again "to discuss the documents that he needed to provide," and "specifically instructed Mr. Emiabata to complete" a Form 2025, and "to obtain a driving history record . . . going back five years." S.A. 119. On February 5, 2016, Mr. Emiabata "commenced contract performance." S.A. 29.

On March 10, 2016, the USPS contacted Mr. Emiabata by email to explain that it was "still waiting on" a completed Form 2025 and a "current [motor vehicle record] going back five years." S.A. 123. The USPS asked

Mr. Emiabata to "please respond . . . ASAP." S.A. 125. In an email sent later that day, the USPS explained that if Mr. Emiabata did not respond within "[four] calendar days," the Delivery Contract "w[ould] be terminated." S.A. 125. On March 13, 2016, the USPS again contacted Mr. Emiabata by email to reiterate that he was "still missing several vital documents," including a completed Form 2025 and a "current [motor vehicle record] from all states [he] ha[d] lived in the past five years." S.A. 124.

"A few days" after the March 10, 2016 email, Mr. Emiabata submitted to the USPS "a completed Form 2025 dated March 10, 2016" ("the March 2016 Form 2025"). S.A. 120; *see* S.A. 99–100. However, "[a]t no time did Mr. Emiabata submit a . . . driving record for himself or any other prospective driver[.]" S.A. 120. On the March 2016 Form 2025, Mr. Emiabata responded to Question 22 by identifying two incidents: First, a charge of "reckless driving" issued by the Commonwealth of Virginia on April 1, 2014, which Mr. Emiabata claimed was "still under litigation"; and second, a charge of "fail[ure] to obey [a] sign" issued by the State of Delaware on May 30, 2013, for which Mr. Emiabata was "convict[ed]" and paid a fine. S.A. 100; *see* S.A. 129–30. On March 22, 2016, the USPS learned from a newspaper article dated February 27, 2015, that in February 2015, Mr. Emiabata had been "tried and convicted" of "reckless driving (failing to maintain control)" in connection with a traffic incident that occurred in April 2014 in Wythe County, Virginia, in which two people were killed and another was "seriously injur[ed]." S.A. 102; *see* S.A. 131.

On March 23, 2016, in a "final decision of the Contracting Officer pursuant to the Contract Disputes Act" ("CDA"), 41 U.S.C. §§ 7101–7109 (2012), the USPS informed Mr. Emiabata that the Delivery Contract was being terminated "for default [e]ffective Friday March 25, 2016, close of business." S.A. 40; *see* S.A. 40–41 (Final Decision). Among other reasons, the Contracting Officer explained

that the USPS was terminating the Delivery Contract "due to [its] inability to obtain from [Mr. Emiabata] the mandatory forms, specifically [his motor vehicle record] dating back five years" and "the necessary insurance documents." S.A. 40. Moreover, the Contracting Officer explained, that Mr. Emiabata had "provided false information in response to Question 22 on . . . Form 2025"; specifically, while Mr. Emiabata "stated that litigation was ongoing regarding a Virginia reckless driving charge, . . . in fact, [he] w[as] convicted of reckless driving in February 2015, in an accident that killed [two] people." S.A. 40.

In March 2017, Mr. Emiabata filed suit against the USPS in the Court of Federal Claims, alleging, inter alia, wrongful termination of the Delivery Contract by the USPS ("wrongful termination claim"), and seeking monetary damages in the amount of $2.6 million related to the USPS's administration of the contract ("contract-based claims"). Complaint 1–5, *Emiabata v. United States*, No. 1:17-cv-00447-PEC (Fed. Cl. Mar. 24, 2017), ECF No. 1. In June 2017, Mr. Emiabata filed an administrative claim with the Contracting Officer, raising similar claims against the USPS and requesting the same monetary relief. Appendix to Motion to Dismiss 64–65, *Emiabata v. United States*, No. 1:17-cv-00447-PEC (Fed. Cl. June 26, 2017), ECF No. 11-1 (Certified Claim). That same month, the Government moved to dismiss Mr. Emiabata's contract-based claims pursuant to Rule 12(b)(1) of the RCFC, arguing that the Court of Federal Claims "does not possess jurisdiction to entertain Mr. Emiabata's [contract-based] claims," because "[t]hose claims were not submitted to the [C]ontracting [O]fficer in a certified claim" before filing suit. Motion to Dismiss 1, 6, *Emiabata v. United States*, No. 1:17-cv-00447-PEC (Fed. Cl. June 26, 2017), ECF No. 11. The Government also moved to dismiss Mr. Emiabata's wrongful termination claim pursuant to Rule 12(b)(6) of the RCFC. *Id.*

In November 2017, the Court of Federal Claims dismissed Mr. Emiabata's contract-based claims, "for lack of subject matter jurisdiction under R[ule] 12(b)(1)," but concluded that the Government's "R[ule] 12(b)(6) challenge to [Mr. Emiabata's] wrongful termination . . . claim . . . must be converted to a motion for summary judgment." S.A. 24. In February 2018, the Government moved for summary judgment of Mr. Emiabata's wrongful termination claim, arguing that "there are no genuine issues of material fact and Mr. Emiabata's challenge to the termination of his contract for default fails as a matter of law[.]" Motion for Summary Judgment 1, *Emiabata v. United States*, No. 1:17-cv-00447-PEC (Fed. Cl. Feb. 5, 2018), ECF No. 29. In August 2018, the Court of Federal Claims granted the Government's motion. S.A. 12.

DISCUSSION

I. Pro Se Appellants

"Pro se [appellants]," such as Mr. Emiabata, "are not expected to frame issues with the precision of a common law pleading." *Roche v. U.S. Postal Serv.*, 828 F.2d 1555, 1558 (Fed. Cir. 1987). Pro se appellants are entitled to a liberal construction of their pleadings, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972) (requiring that allegations contained in pro se pleadings be held to "less stringent standards than formal pleadings drafted by lawyers"), "but that liberal standard does not alleviate Mr. [Emiabata's] burden of establishing that the Court of Federal Claims has jurisdiction over his case," *Bowles v. United States*, 639 F. App'x 647, 648 (Fed. Cir. 2016); *see Henke v. United States*, 60 F.3d 795, 799 (Fed. Cir. 1995).

II. Motion to Dismiss

A. Standard of Review and Legal Standard

"We review a Court of Federal Claims decision to dismiss for lack of jurisdiction de novo," and "[t]he [appellant] bears the burden of establishing jurisdiction by a

preponderance of the evidence." *Diaz v. United States*, 853 F.3d 1355, 1357 (Fed. Cir. 2017) (citations omitted). We review jurisdictional findings of fact for clear error. *See Banks v. United States*, 314 F.3d 1304, 1307–08 (Fed. Cir. 2003). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

The CDA provides that "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1). We have interpreted this "present-ment" requirement to be a "jurisdictional prerequisite to further legal action." *Sharman Co. v. United States*, 2 F.3d 1564, 1568 (Fed. Cir. 1993), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995). Thus, a "prerequisite for jurisdiction of the Court of Federal Claims over a CDA claim is a *final decision* by a contracting officer[.]" *Northrop Grumman Computing Sys., Inc. v. United States*, 709 F.3d 1107, 1111–12 (Fed. Cir. 2013); *see England v. Swanson Grp., Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004) (holding that the Court of Federal Claims lacks "jurisdiction over an appeal of a contracting officer's decision . . . unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim").

## B. The Court of Federal Claims Properly Concluded that It Lacked Jurisdiction over Mr. Emiabata's Contract-Based Claims

The Court of Federal Claims found that "[e]xcept for the wrongful termination . . . claim, which ha[d] been the subject of a final decision of the [Contracting Officer], . . . none of the claims set forth in [Mr. Emiabata's C]omplaint were presented to the [Contracting Officer] for a final decision before [Mr. Emiabata] filed suit in th[e

C]ourt [of Federal Claims]." S.A. 18. The Court of Federal Claims concluded that because Mr. Emiabata did not "submit a certified claim for his contract-based claims to the [Contracting Officer] before filing suit" in March 2017, "all of his claims in the [C]omplaint, other than his wrongful termination . . . claim, are barred by the presentment requirement of the CDA." S.A. 20. Mr. Emiabata disputes the Court of Federal Claims' conclusion, arguing that "[t]here [is] CDA [j]urisdiction over [his] . . . [c]laims," Appellant's Br. 11, because Mr. Emiabata "presented [his] claim[s] to the [C]ontracting [O]fficer," *id.* at 12. We disagree with Mr. Emiabata.

By its terms, the Delivery Contract is "subject to" the CDA. S.A. 78 (Section 2.3.6(a)); *see* 39 C.F.R. § 601.109(a) (2016) ("implement[ing]" the CDA in the resolution of contract claims and disputes with the USPS). Mr. Emiabata's Complaint seeks monetary damages in the amount of $2.6 million, including "payments under" the Delivery Contract, reliance damages "made in order to perform the contract," and punitive damages arising from "the action of [USPS] workers" in performance of the contract. Complaint 5, *Emiabata v. United States*, No. 1:17-cv-00447-PEC (Fed. Cl. Mar. 24, 2017), ECF No. 1. Because each of these claims "relat[es] to" the Delivery Contract, 41 U.S.C. § 7103(a)(1); *see Applied Cos. v. United States*, 144 F.3d 1470, 1478 (Fed. Cir. 1998) (holding that to be a claim "relating to the contract" under 41 U.S.C. § 7103(a)(1), the claim "must have some relationship to the terms or performance of a government contract"), the Court of Federal Claims had jurisdiction over Mr. Emiabata's contract-based claims only if the CDA's presentment requirement was met, *see Northrop Grumman*, 709 F.3d at 1111–12.

Except for Mr. Emiabata's wrongful termination claim, which was the subject of the Contracting Officer's March 2016 Final Decision, *see* S.A. 40–41, none of the other claims set forth in Mr. Emiabata's Complaint, i.e., Mr. Emiabata's contract-based claims, were presented to

the Contracting Officer for a final decision before filing suit in the Court of Federal Claims.  Because Mr. Emiabata did not satisfy this prerequisite, the Court of Federal Claims lacked jurisdiction to consider those claims.  *See Northrop Grumman*, 709 F.3d at 1111–12.  Moreover, Mr. Emiabata's belated filing of a claim with the Contracting Officer in June 2017, does not cure his failure to present his contract-based claims to the Contracting Officer before filing suit in the Court of Federal Claims.  *See Sharman*, 2 F.3d at 1572 (holding that once a claim is "the subject of litigation," any action by a contracting officer on a later-submitted claim is a "nullity" and cannot establish jurisdiction over the claim in the Court of Federal Claims).  Accordingly, the Court of Federal Claims properly concluded that it lacked jurisdiction over the contract-based claims raised in Mr. Emiabata's Complaint.

## III. Motion for Summary Judgment

### A. Standard of Review and Legal Standard

"We review the Court of Federal Claims' grant of summary judgment de novo, applying the same standard applied by the court below."  *Nutt v. United States*, 837 F.3d 1292, 1295 (Fed. Cir. 2016).  Rule 56(a) of the RCFC provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party."  *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citations omitted).

When a contractor challenges a default termination, the government bears the burden of establishing the validity of the termination.  *See Johnson Mgmt. Grp. CFC, Inc. v. Martinez*, 308 F.3d 1245, 1249 (Fed. Cir. 2002) ("The government bears the burden of proof in establishing the validity of a default termination."); *Lisbon Contractors,*

*Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) ("[T]he government should bear the burden of proof with respect to the issue of whether termination for default was justified[.]"). Once default has been proven, the contractor bears the burden of establishing that the default was excused by fault of the government. *See McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1353 (Fed. Cir. 2009) (holding that once "the government has satisfied its burden to justify the default termination[,]" "the contractors have the burden of going forward to prove" that their default was "excusable"), *vacated on other grounds by Gen. Dynamics Corp. v. United States*, 563 U.S. 478 (2011); *see also Kennedy v. United States*, 164 Ct. Cl. 507, 512 (1964) ("If we hold that [the contractor] defaulted, we must determine whether the default was or was not excusable.").

## B. The Court of Federal Claims Properly Granted the Government's Motion for Summary Judgment

The Court of Federal Claims concluded that "[b]ecause there is no genuine issue of material fact as to the[] three grounds for default" relied upon by the Government, "and because [Mr. Emiabata] has not pointed to any [G]overnment fault which would excuse these particular grounds for default, the default termination is justified." S.A. 12. Specifically, the Court of Federal Claims found that Mr. Emiabata's "wrongful termination claim fails" because of his failure to provide "adequate proof of insurance" "even if no other ground for default exists," S.A. 6, 8, but "[f]or the sake of completeness," the court further found that the "default termination must be sustained" because the Contracting Officer "reasonably concluded" both that Mr. Emiabata "was in default for failure to submit a valid driving history" and that he had "concealed his reckless driving conviction and, by doing so, concealed the facts of his serious accident, from the USPS," S.A. 8, 10, 11. Mr. Emiabata disputes the Court of Federal Claims' conclusion, arguing that "[n]o [e]vidence" supports the courts' granting of the Government's Motion for Summary Judgment, and it should have

excluded the Government's "new reasons for [the Contracting Officer's] default termination." Appellant's Br. 38. We disagree with Mr. Emiabata.

The Court of Federal Claims properly granted the Government's Motion for Summary Judgment. As the USPS informed Mr. Emiabata in December 2015, the Delivery Contract required Mr. Emiabata to "establish and maintain continuously in effect" certain required levels "of liability insurance for all motor vehicles to be used under th[e] contract." S.A. 57; *see* S.A. 136 ("The supplier must maintain the required level of insurance for the entire term of the contract."). The Delivery Contract further required that Mr. Emiabata "shall furnish to the contracting officer, prior to commencement of service under th[e] contract, and thereafter as the contracting officer may require, proof that the supplier has all required insurance, plus a copy of the applicable policy or policies." S.A. 57. If Mr. Emiabata "fail[ed] to establish and maintain continuously in effect insurance as required by th[e] contract, or fail[ed] to provide proof of insurance prior to commencement of service and thereafter as required by the contracting officer[,]" the Delivery Contract "[could] be terminated" by the USPS for default. S.A. 80 (Section 2.3.10(m)).

In his proposal, Mr. Emiabata identified himself and Sylvia Emiabata as the only "employees . . . assigned as drivers" to the proposed route. S.A. 95. However, the unredacted portions of the insurance documents submitted by Mr. Emiabata to the USPS, viz., the Application for Insurance, S.A. 139–42, and Commercial Auto Insurance Coverage Summary, S.A. 144–47, identified "Roland Hunter" as the only "[r]ated driver," S.A. 144. Despite the contractual requirement to "provide proof of insurance," S.A. 80, and the USPS's multiple requests to provide "the necessary insurance documents," S.A. 40, Mr. Emiabata directs us to no record evidence, and we have found none, demonstrating that he submitted to the USPS proof of the requisite liability insurance for himself or Sylvia Emiabata at any time,

*see generally* Appellant's Br. Instead, Mr. Emiabata argues that Philema Brothers "is not required . . . [to] put all the names of its drivers" on its insurance policies. *Id.* at 41. Regardless of the veracity of Mr. Emiabata's contention, the Delivery Contract explicitly required Mr. Emiabata to "provide proof of insurance," S.A. 80, which Mr. Emiabata failed to do. Thus, because Mr. Emiabata failed to submit proof of liability insurance to the USPS as required under the Delivery Contract, he was in default as a matter of law.

The Delivery Contract also required Mr. Emiabata to "submit to the [USPS] . . . a current driving record" for "all individuals who . . . need authority to drive." S.A. 55; *see* S.A. 135–36 (providing a "listing of the required forms," including a "[f]ive-year driving record" "for each . . . driver"). Specifically, for each "employee" who was to "ha[ve] driving responsibilities," Mr. Emiabata was required to submit "[a] [five]-year driving record . . . except in those states in which only [three]-year driving records are issued." S.A. 55. Again, Mr. Emiabata directs us to no record evidence, and we have found none, demonstrating that he submitted the requisite motor vehicle records to the USPS at any time. *See generally* Appellant's Br. Instead, Mr. Emiabata directs us to a document—apparently an excerpt from the USPS's Management Instruction ("MI") PO-530-2009-4—and argues that according to the requirements outlined in that document, he was "[e]ligib[le] to [d]rive." Appellant's Br. 42; *see* S.A. 105–17 (MI PO-530-2009-4). Even accepting this as true, Mr. Emiabata was not excused from submitting the requisite motor vehicle records to the USPS under the Delivery Contract, which he failed to do. Thus, because Mr. Emiabata failed to submit motor vehicle records to the USPS as required under the Delivery Contract, he was in default as a matter of law for this reason as well.

Finally, the Delivery Contract provides that it "may be terminated" if Mr. Emiabata is "not reliable [or] trustworthy" or if he "allows any employed individual to operate a vehicle in connection with th[e] contract who has a record

indicating that it would be hazardous for that individual to do so." S.A. 80 (Section 2.3.10(g), (i)). In February 2015, Mr. Emiabata was "convicted" of "reckless driving" in connection with a traffic incident in Virginia that killed two people and "seriously injur[ed]" another. S.A. 102. Despite this, Mr. Emiabata responded "N/A" to Question 22 on the September 2015 Form 2025 submitted to the USPS, S.A. 98, and "commenced contract performance" in February 2016, S.A. 130. Mr. Emiabata changed his response to Question 22 on the March 2016 Form 2025 submitted to the USPS, acknowledging that he had been "[c]harge[d]" with "reckless driving," but indicating that the incident was "still under litigation," S.A. 100, despite the fact that Mr. Emiabata had actually been "tried and convicted" of reckless driving more than a year earlier, S.A. 102. Mr. Emiabata's response was particularly misleading, as he indicated that he had been "convict[ed]" of the other incident, viz., "fail[ure] to obey [a] sign," identified on the March 2016 Form 2025. S.A. 100. Notably, Mr. Emiabata signed both Form 2025s submitted to the USPS, certifying that "the statements made by [him] . . . [were] true, complete, and correct to the best of [his] knowledge and belief." S.A. 100. Thus, because Mr. Emiabata twice made false and misleading statements to the USPS concerning his past traffic violations, specifically his reckless driving conviction, we agree with the Court of Federal Claims that Mr. Emiabata demonstrated himself to be unreliable and untrustworthy, and therefore in default of the Delivery Contract as a matter of law. S.A. 11. Mr. Emiabata has not directed us to any fault by the USPS that would excuse his conduct underlying the grounds for default discussed herein. *See generally* Appellant's Br. Accordingly, the

Court of Federal Claims properly granted the Government's Motion for Summary Judgment.[4]

CONCLUSION

We have considered Mr. Emiabata's remaining arguments and find them unpersuasive. Accordingly, the Opinions of the U.S. Court of Federal Claims are

**AFFIRMED**

---

[4] Mr. Emiabata's argument that the Court of Federal Claims should have excluded the Government's "new reasons for [the Contracting Officer's] default termination" not known to the USPS at the time of termination, Appellant's Br. 38, is without merit, as we will "sustain[] a default termination if justified by circumstances at the time of termination, regardless of whether the Government originally removed the contractor for another reason," *Kelso v. Kirk Bros. Mech. Contractors, Inc.*, 16 F.3d 1173, 1175 (Fed. Cir. 1994) (citation omitted); *see Pots Unlimited, Ltd. v. United States*, 600 F.2d 790, 793 (Ct. Cl. 1979) ("[I]t is settled law that a party can justify a termination if there existed at the time an adequate cause, even if then unknown." (citation omitted)).